IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

IVAN HARVEY,
     Plaintiff,

v.                              Case No: 3:09cv402/WS/CJK

EFIONG O. ANDEM, et al.,
     Defendants.

_____

## REPORT AND RECOMMENDATION

This case filed pursuant to 42 U.S.C. § 1983 is before the court upon the parties' cross-motions for summary judgment. (Docs. 77, 81).  Upon review of the motions, responses, summary judgment evidence and relevant legal authorities, the undersigned recommends that plaintiff's motion (doc. 81) be denied and defendants' motion (doc. 77) be granted in part and denied in part.

## BACKGROUND AND PROCEDURAL HISTORY

This civil rights case involves claims that defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth Amendment, as well as a claim that one defendant retaliated against plaintiff in violation of the First Amendment.  Plaintiff, proceeding *pro se*, is an inmate of the Florida penal system currently confined at Okaloosa Correctional Institution.  His complaint names seven defendants, each sued in his or her individual capacity:  Dr. Andem, Dr. Lord,

Dr. Thayer,[1] Cathy Allin, Dr. Aviles, M. Nichols and Dr. Collins. (Doc. 1). Doctor Andem is the Chief Health Officer ("CHO") assigned to Jackson Correctional Institution. (Doc. 77, Ex. F, Andem Aff. ¶ 2). He was the CHO at Holmes Correctional Institution ("Holmes CI") at times relevant to the complaint. Doctor Lord is an orthopedic surgeon, and at times relevant to the complaint provided contract medical services to the Florida Department of Corrections. (*Id.*, Ex. H, Lord Aff. ¶ 1). Ms. Allin was the Senior Health Services Administrator ("SHSA") at Union Correctional Institution ("Union CI") at times relevant to the complaint. (*Id.*, Ex. I, Allin Aff. ¶ 2). Doctor Aviles is the CHO assigned to Union CI. (*Id.*, Ex. G, Aviles Aff. ¶ 1). Nurse Practitioner Nichols is an Advanced Registered Nurse Practitioner ("ARNP") assigned to Santa Rosa CI. (*Id.*, Ex. J, Nichols Aff ¶ 1). Doctor Collins was the CHO at Santa Rosa CI at times relevant to the complaint. (*Id.*, Ex. K, Collins Aff. ¶ 2). Plaintiff has voluntarily dismissed his claims against defendant Dr. Thayer. (Docs. 74, 75, 85).

On December 13, 2010, defendants filed a joint motion for summary judgment with incorporated statement of undisputed material facts (doc. 77), to which plaintiff responded (docs. 84, 87, 88). On December 21, 2010, plaintiff filed a motion for summary judgment (doc. 81) and statement of undisputed material facts (doc. 82), to which defendants responded (doc. 86). Due to the number of defendants and extensive factual record, the court will address the cross-motions of plaintiff and the various defendants in three separate sections according to institution: first Dr. Andem (Holmes CI); then Dr. Lord, Dr. Aviles and Ms. Allin (Union CI); and finally Nurse

---

[1]Plaintiff's complaint misspells this defendant's name as "Thayers." The correct spelling is "Thayer." (*See* Doc. 17).

Practitioner Nichols and Dr. Collins (Santa Rosa CI).

For purposes of all motions, the following facts are undisputed. Sick-call requests are not kept in the inmate's medical file. (Doc. 82, Ex. P, Allin's Answer to Pl.'s Interrog. No. 4). Upon receipt, nursing staff reviews the sick-call request and triages the inmate. (Doc. 77, Ex. I, Allin Aff., 3; *see also* Doc. 82, Ex. P, Allin's Answer to Pl.'s Interrog. No. 7). Based on the nurse's objective findings, (s)he may or may not refer the particular sick-call request to the doctor. (*Id*.). If a request is not referred to a doctor, it is because the examining nurse determined it was unnecessary. (*Id*.). The nurse will make note of the request and its disposition in the inmate's chart. Therefore, unless a particular defendant personally processed a sick-call request, a defendant's knowledge of a sick-call request (and its contents) is confined to the notations appearing in the inmate's chart.

An inmate request is separate and distinct from a sick-call request, and is handled differently. (Doc. 77, Ex. I, Allin Aff. ¶ 3). An inmate request is first reviewed by the Health Services Administrator, who determines whether or not the request must be forwarded to medical staff. (*Id*.). This determination is based on the inmate's subjective complaints and a review of the medical record to determine whether the inmate complained of the same symptoms via a sick-call request prior to submitting the inmate request, and whether medical staff has taken any action. (*Id*.). An inmate request is not the proper procedure to seek medical attention. An inmate must fill out a sick-call request detailing medical need in order to be seen by medical staff. (*Id*.).

## LEGAL STANDARDS

Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510. The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence or conclusory allegations is insufficient. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553-54, 91 L. Ed. 2d 265 (1986). In resolving a summary judgment motion, the court "reviews the evidence and draws all reasonable inferences in the light most favorable to the non-moving party." *Owens v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011).

The Rule 56 standard is not affected by the filing of cross-motions for summary judgment. The court must evaluate each individual motion on its own merits, viewing the evidence in favor of the nonmoving party in each instance. *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, 443 F. Supp.2d 1284, 1293-94 (N.D. Ala. 2006); *see*

*also Shaw v. Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538-39 (5ᵗʰ Cir. 2004) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."); 10A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed.1998) ("The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.").

Qualified Immunity Standard

Defendants seek summary judgment on the basis of qualified immunity.  The doctrine of qualified immunity is a guarantee of fair warning.  *McElligott v. Foley,* 182 F.3d 1248, 1260 (11ᵗʰ Cir. 1999).  It shields government officials from individual capacity suits against them for acts that do not violate a clearly established statutory or constitutional right of which a reasonable person would have known given the circumstances and information the official possessed at the time of the conduct.  *Hope v. Pelzer*, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); *Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  Qualified immunity ensures that individuals can reasonably anticipate when their conduct may give rise to liability.  Therefore, liability attaches only if the contours of the right allegedly violated are sufficiently clear that a reasonable person would understand that what he is doing violates that right.  *McElligott*, 182 F.3d at 1260 (citing *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)).

Requisite to showing qualified immunity, the public official "must first prove

that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Id.*

Courts apply a two-pronged test when evaluating a claim of qualified immunity:  (1) whether, on the facts alleged, a constitutional right was violated; and (2) whether the right was "clearly established."  *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001).  The court may exercise its discretion in deciding which of the two prongs should be addressed first in light of the circumstances in the particular case at hand.  *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).  The court may grant qualified immunity if the plaintiff fails to carry his burden on either of the two prongs.  *See, e.g., Pearson*, 129 S.Ct. at 822-23 (evaluating only *Saucier*'s second prong and holding that law enforcement officers were entitled to qualified immunity because the unlawfulness of their conduct was not clearly established).

Eighth Amendment Standard

The government has a well-settled constitutional duty to provide minimally adequate medical care to prisoners.  *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991).  Nevertheless, not every claim by a prisoner that he has not received adequate medical treatment states an Eighth Amendment violation.  *Id*. at 105, 97 S.Ct. at 291. To prevail on a deprivation of medical care claim, a prisoner must prove three elements.  First,  "an objectively serious medical need," so grave that, "if left unattended, poses a substantial risk of serious harm."  *Taylor v. Adams*, 221 F.3d

1254, 1258 (11th Cir. 2000) (internal quotation marks, alterations and citations omitted). "[A] serious medical need is . . . one . . . diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (internal quotation marks omitted). The seriousness of the deprivation of the need is measured by the detrimental effect the deprivation brought upon the person. *Hill v. DeKalb Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1188-89 (11th Cir. 1994).

The second element requires "a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor*, 221 F.3d at 1258. "To show the required subjective intent to punish, a plaintiff must demonstrate that the public official acted with an attitude of 'deliberate indifference.'" *Id.* (quoting *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)). Deliberate indifference is not established "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 56 (1994). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1983. Disregard of the risk is also a question of fact that can be shown by standard methods. *Id.* at 846, 114 S.Ct. at 1983.

Obviously, a complete denial of readily available treatment for a known serious medical condition violates the Constitution. *Harris v. Coweta Cnty.*, 21 F.3d 388,

393 (11th Cir. 1994). Also, medical treatment can be so slight as to amount to no treatment at all. Therefore, the mere fact that treatment was provided does not end the inquiry. *See Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989) ("[G]rossly incompetent medical care or choice of an easier but less efficacious course of treatment can constitute deliberate indifference."); *see also Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) ("Medical treatment that is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness violates the eighth amendment."). In order to prevail, however, the prisoner must prove that the officials' response was so inadequate as to "constitute an unnecessary and wanton infliction of pain" and was not "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law." *Taylor*, at 1258. Plaintiff must show that the challenged conduct was "very unreasonable in light of a known risk" of harm or suffering. *Hardin v. Hayes*, 52 F.3d 934, 939 (11th Cir. 1995) (citing *Farmer*, 114 S.Ct. at 1978-79). Disputes regarding the level of treatment or the existence of other treatment options do not alone evidence cruel and unusual punishment. *Estelle*, 429 U.S. at 107, 97 S.Ct. at 292; *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985). Where the inmate has received medical attention, and the dispute is over the adequacy of that attention, courts should be reluctant to question the accuracy or appropriateness of the medical judgments that were made. *Harris v. Thigpen*, 941 F.2d at 1507 (quoting *Waldrop v. Evans*, 871 F.2d at 1035); *see also Woody v. Cronic*, 401 Fed. Appx. 509, 512 (11th Cir. 2010) (unpublished opinion) ("Generally, an inmate who receives a medical diagnosis and care, but desires a different diagnosis or treatment, cannot show deliberate indifference."). A difference of opinion over

matters of medical judgment does not give rise to a constitutional claim. *Harris*, 941 F.2d at 1505; *Waldrop* at 1033; *Murrell v. Bennett*, 615 F.2d 306, 310 n. 4 (5th Cir. 1980).

Some of the ways in which prison officials might avoid Eighth Amendment liability is to show: (1) "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger;" (2) that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent;" or (3) that "they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 114 S.Ct. at 1982-83.

For the final element of an Eighth Amendment claim, a plaintiff must show the officials' deliberate indifference caused the plaintiff's injury. *Taylor*, at 1258; *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306–07 (11th Cir. 2009) (reiterating the elements of an Eighth Amendment claim).

## CLAIM AGAINST DR. ANDEM

Rule 56 Evidence

On April 29, 2008, plaintiff was the subject of a use of force while housed at Holmes CI. (Doc. 1, p. 7-A; Doc. 77, p. 4). The facts surrounding the use of force are not material to the issues here. Plaintiff's claim against Dr. Andem involves the medical attention plaintiff received after the incident, specifically, whether defendant Dr. Andem provided inadequate medical treatment for plaintiff's alleged back condition and pain from April 29, 2008 (the date of the use of force) to June 16, 2008 (the date plaintiff was transferred to Union CI).

On April 29, 2008 at approximately 12:40 p.m., plaintiff received a post-use-of-force examination by Nurse Turner, a non-party.  (Doc. 77, Ex. F, Andem Aff. ¶ 4 and Attach. 1).   Nurse Turner noted on the examination record that plaintiff complained of pain in his left ankle, epigastric region and mouth.  (*Id*.; *see also* Doc. 81, Ex. A).[2]  Her examination of plaintiff revealed no edema, redness, discoloration, bruising or open areas to the ankle or epigastric region, and no open areas in the mouth or gumline.  (*Id*.).  No injuries were identified.  (*Id.*).  Accordingly, Nurse Turner did not notify a physician or provide treatment.  (*Id*.).  Plaintiff was discharged with instructions to "[r]eport any abnormal findings." (*Id.*).  Dr. Andem reviewed and signed the post-use-of-force examination record on May 14, 2008.  (*Id*.).

Later in the day on April 29, 2008, at approximately 8:00 p.m., plaintiff submitted a sick-call request in which he complained, "I have a very loose tooth and a serious toothache which has initiated severe headache.  My back is giving me more pain also.  I also need my nitro [illegible]."  (Doc. 82, Ex. A).  He stated this problem/symptom started "approximately 12:20 p.m. when I was assaulted by staff while being handcuffed." (*Id*.).  The following day, plaintiff was called out for sick-call at 10:30 p.m.  (Doc. 77, Ex. F, Andem Aff. ¶ 5 and Attach. 2).  Health care staff executed a form entitled "Refusal of Health Care Services," noting plaintiff refused

---

[2]Although plaintiff disputes Nurse Turner's documentation and asserts he also complained of back pain, (doc. 84, Pl.'s Aff. ¶ 1; *see also* doc. 81 p. 4 ¶ 2 ("[m]edical personnel failed to document all of plaintiff's complaints")), this factual dispute is immaterial to plaintiff's deliberate indifference claim against defendant Dr. Andem.  The only facts relevant to the deliberate indifference claim are the circumstances of which <u>Dr. Andem</u> was aware, either through plaintiff's verbal complaints directly to him, or through written complaints (including grievances) reviewed by Dr. Andem or appearing in plaintiff's medical record.  Plaintiff does not allege, and the record does not support a finding that Dr. Andem was present at the post-use-of-force examination.  Therefore, Andem's knowledge of plaintiff's complaints during the post-use-of-force-examination is limited to what was documented on Nurse Turner's examination record.

to leave his cell unless provided a walker or cane.  (*Id*.).  In the space provided for plaintiff's signature, plaintiff wrote: "Inmate doesn't refuse treatment, Inmate refuses to further injur [sic] himself by walking without proper support."  (*Id*.; *see also* Doc. 84, Pl.'s Aff. ¶ 2).  Dr. Andem reviewed and signed the form on May 5, 2008.  (*Id*.).

On May 4, 2008, health care staff (Nurse Bush) was notified plaintiff refused the last five meals.  (Doc. 77, Ex. F, Andem Aff. ¶ 5 and Attach. 3).  Nurse Bush completed a psychiatric referral.  The same day, Dr. Andem scheduled an appointment for plaintiff to see him.  (*Id*.).

Plaintiff submitted another sick-call request on May 6, 2008.  (Doc. 1, p. 7-A). A copy of that request does not appear in the record; however, plaintiff states, and defendants do not dispute, plaintiff complained of back pain and requested an x-ray. (*Id*.).  Dr. Andem saw plaintiff at 8:50 that morning.  (Doc. 77, Ex. F, Andem Aff. ¶ 5 and Attach. 3).  Dr. Andem noted plaintiff was able to:  (1) sit up on the bed by himself, (2) get out of the bed by himself, and (3) walk using a walker.  (*Id*.). Plaintiff was given 800 mg. of Motrin for pain and discharged.  (*Id*.).  Upon discharge, plaintiff was escorted back to his cell via wheelchair and provided a walker.  Plaintiff verbalized no complaints.  (*Id*.).  On May 7, 2008, plaintiff initiated a sick-call request seeking an x-ray of his back.  (*Id*.).  Dr. Andem reviewed the request and scheduled an x-ray for the following morning.  (*Id*.).  An x-ray of plaintiff's lumbar spine was taken on May 8, 2008.  (*Id*., ¶ 6 and Attach. 4; Doc. 82, Ex. B).  The results were normal.  There was no evidence of fracture or bony tumor. (*Id*.).  There was no vertebra displacement.  The pedicles, which connect the body of the spinal vertebra to the arch, were intact.  (*Id*.).  The sacroiliac joints, *i.e.*, the joints between the sacrum (which supports the spine) and ilium, also appeared to be intact.

(*Id*.).  Dr. Andem reviewed the results on May 13, 2008, and ordered that the report be placed in plaintiff's file.  (*Id*.).  The results confirmed to Dr. Andem that plaintiff sustained no injuries as the result of the April 29, 2008 use of force.  (Doc. 77, Ex. F, Andem Aff. ¶ 6).

On May 26, 2008, plaintiff filed an inmate request addressed to Dr. Andem. He requested the x-ray results, a lumbar back brace and medication for pain in his back and leg.  (Doc. 77, Ex. F, Andem Aff. ¶ 7 and Attach. 5; Doc. 82, Ex. C).  Nurse Steel (a non-party) responded to the request, advising plaintiff he would be placed on callout for the x-ray results and directing him to submit his other complaints in a sick-call request.  (*Id*.).  The same day, plaintiff filed a formal grievance stating the following complaints:  (1) he was injured during a use of force on April 29, 2008 and informed medical staff of his injuries, (2) he "ha[d] been given no medication for the pain that he [was] in" (3) he had not received his x-ray results and (4) he required a CAT scan or MRI because "certain injuries cannot be detected by x-rays."  (Doc. 77, Ex. F, Andem Aff. ¶ 7 and Attach. 6; Doc. 82, Ex. E).  Plaintiff sought referral to a specialist.  (*Id*.).  Dr. Andem responded to the request on June 3, 2008, advising plaintiff that his x-ray results were normal and that given the results, a CT scan or referral to a specialist was not warranted.  (*Id*.; *see also* Andem Aff., Attach. 3).  Dr. Andem reminded plaintiff that he <u>was</u> in fact given medication for his back pain, specifically, he had a current prescription for Anaprox (a medication used to relieve pain, inflammation and fever) which Andem prescribed earlier on April 4, 2008, during a sick-call visit when plaintiff complained of back and shoulder pain.  (*Id*., Andem Aff. ¶ 8 n. 1 and Attach. 3).

Plaintiff received the x-ray results on June 7, 2008.  (Doc. 77, Andem Aff.,

Attach. 3).  Plaintiff filed another inmate request on June 9, 2008, stating he was "still in extreme pain daily," and the prescribed pain medication was "futile."  (Doc. 77, Ex. F, Andem Aff. ¶ 7 and Attach. 7; Doc. 82, Ex. D).  He claimed a CT scan was necessary "because a lumbar facet joint fracture does not always show on an x-ray," and requested referral to an orthopedic specialist.  (*Id.*).  Dr. Andem received the request on June 10, 2008.  The same day, Dr. Andem requested a consultation from the Orthopedic Surgeon at Reception and Medical Center ("RMC"), and informed plaintiff of the consultation request.  (Doc. 77, Ex. F, Andem Aff. ¶ 7 and Attachs. 3, 7; *See also* Doc. 77, Ex. H, Lord Aff., Attach. 1).  The consultation request sought an evaluation and recommended treatment plan, describing plaintiff's condition as "persistent complaint of low back pain as well as leg and hip pain."  (Doc. 77, Ex. H, Lord Aff., Attach. 1).  That was Dr. Andem's last contact with plaintiff.  (Doc. 77, Ex. F, Andem Aff. ¶ 7 and Attach. 3).  Plaintiff was transferred out of Holmes C.I. to Union C.I. on June 16, 2008.  (*Id.*, Andem Aff. ¶ 7 and Attach. 8).

Analysis

Plaintiff claims defendant Dr. Andem violated the Eighth Amendment when he delayed ordering an x-ray, delayed referring plaintiff to an orthopedic specialist, and failed to treat plaintiff's back pain.  (Doc. 1, pp. 7-A, 7-B).  To prevail on his motion for summary judgment, plaintiff must show two things:  there is no genuine dispute as to any material fact and he is entitled to judgment as a matter of law. Plaintiff argues his evidence establishes the following facts, which cannot genuinely be disputed:  1) his back was injured on April 29, 2008, (2) Dr. Andem delayed ordering an x-ray until over one week later, (3) during the relevant period (April 29, 2008 - June 16, 2008), he "repeatedly" complained of back pain and requested

stronger medicine but Dr. Andem denied his requests, and (4) Dr. Andem delayed referring plaintiff to an orthopedic specialist until one month following the alleged injury. (Doc. 82, p. 2). As "evidence" of his injury, plaintiff relies on his April 29, 2008 sick-call request. (*Id*. and Ex. A). That sick-call request, however, merely documents plaintiff's complaint of a toothache, headache and pain following the use of force. It could not enable a reasonable jury to find plaintiff's back was injured during the April 29, 2008 use of force. Indeed, the medical evidence in the record (the x-ray results discussed above as well as the MRI results discussed in the following section) establishes beyond dispute that plaintiff did not sustain a back injury on April 29, 2008.

Further, although it is undisputed that Dr. Andem did not order an x-ray until May 7, 2008, the evidence does not reasonably support a finding that Dr. Andem "delayed" ordering the x-ray. To the contrary, the evidence establishes that following the April 29, 2008 incident, Dr. Andem first learned of plaintiff's renewed complaints of back pain on May 6, 2008. He scheduled an x-ray the following day. On these facts, a reasonable jury could not conclude Dr. Andem was deliberately indifferent with regard to ordering the x-ray.

As to treating plaintiff's pain and referring plaintiff to an orthopedic surgeon, plaintiff's evidence of his "repeated" complaints of pain consists of the May 26, 2008 inmate request, the May 26, 2008 formal grievance, and the June 9, 2008 inmate request. (Doc. 82, p. 2 ¶ 3 and Exs. C-F). The record establishes that Dr. Andem prescribed Anaprox for plaintiff's pain during an earlier visit on April 4, 2008. In response to plaintiff's complaint of pain during the May 6, 2008 visit, Dr. Andem prescribed Motrin. When plaintiff complained on May 26, 2008 that he had no

medication for his pain, Dr. Andem reminded him of his Anaprox prescription. Plaintiff made no further complaints of pain until 14 days later on June 9, 2008, when he complained of "extreme pain" and that the pain medication was "futile."  Because of plaintiff's "continued subjective complaints," Dr. Andem immediately requested an orthopedic consultation. On these facts, a reasonable jury could not conclude Dr. Andem was deliberately indifferent with regard to treating plaintiff's pain or referring him to an orthopedic specialist.

In light of the foregoing, plaintiff is not entitled to summary judgment. Although there is no genuine dispute as to any material fact, a reasonable jury could not conclude Dr. Andem was deliberately indifferent to plaintiff's medical condition or pain. *See, e.g., Nimmons v. Aviles*, No. 10-10106, 2011 WL 165433 (11th Cir. Jan. 19, 2011) (holding that prison doctor's allegedly inadequate treatment of state prisoner's knee injury was not deliberately indifferent to prisoner's serious medical needs, as would violate the Eighth Amendment, where doctor ordered x-ray of prisoner's knee, but believed knee problem was not acute at that time, prisoner continued to see doctor for other problems but made no additional complaints of knee pain until almost eight months later, and upon examination of knee after it had worsened, doctor ordered another x-ray and referred prisoner to orthopedist).  The care plaintiff received from Dr. Andem for his alleged back condition and pain was adequate and certainly not "very unreasonable in light of a known risk" of harm or suffering. *Hardin*, 52 F.23 at 939.

Defendant Dr. Andem, on the other hand, meets the summary judgment standard.  Even viewing the summary judgment evidence in the light most favorable to plaintiff, the record establishes there is no genuine dispute as to any material fact

and that Dr. Andem acted reasonably in treating plaintiff's pain and alleged back condition.  Plaintiff fails to produce evidence that Dr. Andem disregarded his pain or an obvious medical need.  On this record, a reasonable jury could not conclude Dr. Andem violated the Eighth Amendment.

CLAIMS AGAINST DR. LORD, DR. AVILES AND MS. ALLIN

Rule 56 Evidence

Plaintiff arrived at Union CI on June 20, 2008.  (Doc. 77, Ex. G, Aviles Aff. ¶ 3 and Attach. 1).  He was examined by Nurse Harris (a non-party).  (Attach. 1).  The exam noted that plaintiff had restrictive passes for no prolonged standing or walking, for the use of a cane, and for front-side cuffing.  (*Id*.).  It was also noted that plaintiff arrived in a wheelchair, but he did not have a wheelchair pass.  (*Id*.).  Plaintiff verbalized no medical complaints.  (*Id*.).  Dr. Nazareno (a non-party) conducted the Clinician Record Review.  (*Id*.).

On June 23, 2008, plaintiff submitted an inmate request complaining he was not authorized to have a wheelchair and that the sink and shower were difficult to access.  (Doc. 82, Ex. G).  He also asked, "[C]an someone tell me how long it will be (approximately) before I am seen by the Orthopedic?  I am still dealing with a lot of pain in my back, and the pain is radiating up my spine." (*Id*.).  Defendant Allin, the Senior Health Services Administrator, received plaintiff's request on June 30, 2008. (*Id*.; Doc. 77, Ex. G, Aviles Aff., Attach. 2).  She responded the following day, indicating they were waiting for RMC to schedule plaintiff's appointment.  (Doc. 82, Ex. G).  Plaintiff's Chronological Record of Health Care (hereinafter "chart") contains a notation that the inmate request was received on June 30, 2008, and

answered by defendant Allin on July 1, 2008.  (Doc. 77, Ex. G, Aviles Aff., Attach. 2).  The substance of the request is not noted.  (*Id.*).

On July 13, 2008, at 8:00 a.m., plaintiff submitted a sick-call request inquiring about his referral to an orthopedic specialist and complaining that Naproxin "really does nothing for the pain."  He further indicated he was having "extreme difficulty getting to and from the shower."  (Doc. 82, Ex. L).  Plaintiff requested "some medicine that will ease (if not take away) the pain and a lumbar support brace to help stabilize my back and a wheelchair so I don't have to walk." (*Id.*).  On July 14, 2008, Senior Licensed Practical Nurse Bickel (a non-party) assessed plaintiff and observed him ambulating with difficulty.  (Doc. 77, Ex. G, Aviles Aff., Attach. 2).  She forwarded his chart "for MD review for pass." (*Id.*).

On July 29, 2008, plaintiff was transferred to RMC for an orthopedic consultation with defendant Dr. Lord to address "persistent complaint of low back pain and left hip pain.  (Doc. 77, Ex. H, Lord Aff. ¶ 4 and Attach. 1).  Dr. Lord saw plaintiff on July 30, 2008. (*Id.*).  Plaintiff ambulated with a cane. (*Id.* at Attach. 1).  Dr. Lord noted plaintiff had pre-existing left mild hemiparesis (weakness) since a cerebral vascular accident (stroke) in 2005. (*Id.*; *see also* Doc. 82, Ex. 7 (discharge summary dated June 22, 2007 prepared by Dr. Jane Foye, a non-party, noting plaintiff had "residual left hemiplegia").  Plaintiff reported he had been assaulted on April 29, 2008, and since then had pain in his lower back and left leg, with numbness, tingling and burning in the leg.  (Lord Aff., Attach. 1).  He also reported that putting pressure on his left leg/foot hurt his lower back. (*Id.*).  Upon examination, Dr. Lord found the symptoms of which plaintiff complained were not consistent with a known nerve pattern. (*Id.*).  He noted plaintiff exhibited poor volitional effort, and it seemed his

exhibited weakness was not due to a medical problem, but lack of effort. (*Id.*). Dr. Lord's medical opinion was that plaintiff was malingering, as he exhibited no genuine abnormalities. (*Id.*). Nonetheless, based on plaintiff's subjective complaints Dr. Lord recommended a MRI of plaintiff's lumbar spine, a pass for a cane, a pass limiting the amount of time plaintiff spent standing or walking, and a pass for a low bunk; all for a period of three months. (*Id.*). Dr. Lord noted he had no clear etiology for the recommendations and made them solely based on plaintiff's subjective complaints pending the results of the MRI. Dr. Lord explains in his affidavit that he "did not have a clear medical basis for recommending the restrictive passes, [he] did so based on Plaintiff's insistence that he was in pain and until the MRI came in negating/supporting his complaints." (Lord Aff. ¶ 4). Upon plaintiff's return to Union C.I. on July 30, 2008, medical staff submitted a request for the MRI examination. (Doc. 77, Ex. G, Aviles Aff. ¶ 5 and Attach. 2).

On August 5, 2008, plaintiff submitted a sick-call request seeking a copy of his wheelchair pass. (*Id.*). SLPN Bickel responded that plaintiff had an upcoming appointment on August 11, 2008. Plaintiff verbalized his understanding. (*Id.*).

On August 11, 2008, defendant Dr. Aviles examined plaintiff. Plaintiff complained of needing "two passes and his med." (*Id.*, ¶ 7 and Attach. 2). Dr. Aviles noted plaintiff had a limited gait. He authorized a wheelchair pass for long distances, a cane pass for ambulation to the shower, a pass restricting the time plaintiff was allowed to stand, and a back brace to provide support to plaintiff's spine. (*Id.*). Dr. Aviles also prescribed plaintiff 500 mg of Naproxin, an anti-inflammatory pain medication, for six months. (*Id.*). Naproxin was "the best anti-inflammatory available." (*Id.*, ¶ 15.).

On August 14, 1008, plaintiff underwent the MRI examination at RMC. (*Id.*, ¶ 8 and Attach. 4). The radiologist reported the following results:

> The alignment is well maintained. The disc spaces appear fairly symmetric throughout. Mild disc degeneration is evident at the LS-S1 level. There is no abnormal bone marrow signal intensity. The conus medullaris appeared unremarkable.

> At the L2-3 level there is a slight bulging of the annulus with an associated small [illegible] disc protrusion which is slightly compressive.

> At the L3-4 level there is a mild diffuse disc bulge also slightly compressive upon the [illegible] sac and contributing to mild bilateral foramina stenosis.

> The L4-5 level also reveals a diffuse disc bulge which is predominantly contributing to foramina stenosis greater towards the left side.

> The L5-S1 level demonstrates a diffuse disc bulge, contributing to bilateral neuroforamina stenosis greater on the right side, where it appears to be compromising the exiting nerve root.

> There are moderate hypertrophic changes in the articulating facets at the L5-S1 level which also encroaches upon the superior recesses of the neuroforamina.

> Mild central canal stenosis is evident at the L2-3 and the L3-4 level.

> IMPRESSION:

> 1. L5-S1 LEVEL DISC DEGENERATION WITH ASSOCIATED DISC BULGE CONTRIBUTING TO FORAMINA STENOSIS AND IMPINGEMENT OF THE EXITING NERVE ROOT.

2.  L2-3 LEVEL MILD DISC BULGE WITH CENTRAL DISC
PROTRUSION MILDLY COMPRESSIVE.  OTHER DETAILS AS
ABOVE.

(Doc. 77, Ex. H, Lord Aff., Attach. 2).  A bulging disc can occur as a result of trauma,

but it can also occur without trauma due to regular degeneration (wear and tear).

(Doc. 82, Ex. R, Lord's Answer to Interrog. No. 3).   "Foramina stenosis" is "a

narrowing of the tunnel through which the nerve exits the spinal canal."  (*Id*., Ex. R,

Lord's Answer to Interrog. No. 1).  If severe, foramina stenosis can produce a type

of pain called radicular pain.  (*Id*., Answer to Interrog. No. 7).  However, such mild

foramina stenosis such as that noted in plaintiff's MRI is usually not severe enough

to pinch the nerve and, consequently, does not result in radicular pain.  (*Id*., Lord's

Answer to Interrog. No. 8).

The Union CI Medical Records department received the MRI results on August

28, 2008.  (Doc. 77, Ex. G, Aviles Aff. ¶ 8 and Attachs. 2, 3).  On September 4, 2008,

Dr. Nazareno reviewed the results and requested a follow-up consultation with Dr.

Lord.  (*Id*.).  Dr. Nazareno requested advice on "further management."  (*Id*., Attach.

3).  An appointment with Dr. Lord was scheduled for October 15, 2008.  (*Id*.).

In the meantime, on August 25, 2008, plaintiff submitted an inmate request

inquiring about the results of the MRI.  Defendant Allin received the request on

August 27, 2008, and responded at 8:40 a.m. on August 28, 2008 that they had not

yet received the results.  (Doc. 82, Ex. H; Doc. 77, Ex. G, Aviles Aff., Attach. 2).  On

September 10, 2008, plaintiff submitted an inmate request for a front cuff pass, which

was issued the following day.  (Aviles Aff. ¶ 8 and Attach. 2).

On September 22, 2008, plaintiff submitted an inmate request inquiring

whether his back brace and MRI results had come in.  He stated he was in pain daily

and inquired whether he would be scheduled for physical therapy. (Doc. 82, Ex. I).
A medical staff member (J. Hewett, a non-party) received the request on September
23, 2008, and responded on September 30, 2008 that plaintiff had a return
appointment with Dr. Lord "coming up" and that Dr. Lord would discuss plaintiff's
issues at that time. (*Id.*). Plaintiff's chart contains a notation that the inmate request
was received on September 23, 2008, and answered by J. Hewett on September 30,
2008. (Doc. 77, Ex. G, Aviles Aff., Attach. 2). The substance of the request is not
noted. (*Id.*).

On September 23, 2008, SLPN Bickel noted on plaintiff's chart that during the
morning medical rounds plaintiff stated to the nurse, "I have not received my front
cuff pass or my back brace." (Doc. 77, Ex. G, Aviles Aff., Attach. 2). Plaintiff's
chart was forwarded "to MD for copy of front cuff pass and size medium back brace."
(*Id.*). On September 24, 2008, Dr. Aviles confirmed plaintiff had a front cuff pass.
(Doc. 77, Ex. G, Aviles Aff. ¶ 8). That same date, a medical staff member (SLPN
Smith, a non-party), submitted a request to "supply" for a back brace. (*Id.*, Ex. G,
Aviles Aff., Attach. 2).

On October 15, 2008, Dr. Lord reexamined plaintiff as part of a follow-up
examination of the MRI. (Doc. 77, Ex. H, Lord Aff. ¶ 6 and Attach. 3). Dr. Lord
noted in his consultation report that plaintiff's MRI showed minimal degenerative
changes. (Attach. 3). The mild degeneration indicated "regular 'wear and tear'" for
a male plaintiff's age. (*Id.*, ¶ 5 and Attach. 3). Although a healed fracture can show
up on an x-ray or MRI, it does not always show up. (Doc. 82, Ex. R, Answer to
Interrog. No. 20). Neither plaintiff's x-ray nor his MRI revealed a healed fracture.
(*Id.*, Answer to Interrog. No. 21).

Dr. Lord noted plaintiff complained of low back pain and left leg pain.  Upon examination, however, Dr. Lord found plaintiff exhibited poor volitional effort and his symptoms seemed significantly out of proportion to the MRI findings.  (Doc. 77, Ex. H, Lord Aff. ¶ 5 and Attach. 3).  Further, the objective findings did not correlate with plaintiff's subjective symptoms.  (*Id*. ¶ 6).  Plaintiff complained of numbness which did not coincide with the normal distribution of a nerve root.  (*Id*.).  Additionally, his loss of sensation did not follow a normal distribution of a pinched nerve in the back.  (*Id*.).  In other words, plaintiff's subjective complaints did not make anatomical sense.  (*Id*.).  Dr. Lord recommended a series of three epidural steroid injections as an option for treatment.  (*Id*. and Attach. 3; Doc. 82, Ex. R, Answer to Interrog. No. 13).  He did not, however, believe they were medically necessary.  He recommended them solely as an option for consideration by plaintiff's treating physician.  When a treatment is medically necessary, Dr. Lord indicates that on the report.  He did not indicate that in plaintiff's case.  (*Id*.).  Dr. Lord's October 15, 2008 consultation was his last contact with plaintiff.  (Doc. 77, Ex. H, Lord Aff. ¶ 7).

Dr. Lord did not recommend stronger pain medication for plaintiff.  Dr. Lord does not recall plaintiff complaining about the effectiveness of his pain medication during their consultation.  (Doc. 77, Ex. H, Lord Aff. ¶ 8; Doc. 82, Ex. R, Lord's Answer to Interrog. No. 16).  Dr. Lord's consultation report does not reflect a request for stronger pain medication.  (Doc. 77, Ex. H, Lord Aff., Attach. 3).  Dr. Lord could have ordered stronger medication absent a request, but only if plaintiff's physical evaluation or MRI demonstrated its necessity.  (Doc. 77, Ex. H, Lord Aff. ¶ 8; Doc. 82, Ex. R, Lord's Answer to Interrog. No. 16).  That was not the case.  The MRI did

not show any degeneration that would merit strong pain medication.  (Doc. 77, Ex. H, Lord Aff. ¶¶ 5, 8; Doc. 82, Ex. R, Lord's Answer to Interrog. No. 16).  More aggressive pain medication would have been narcotics.  (Doc. 77, Ex. G, Aviles Aff. ¶ 15.).

When asked in an interrogatory:  "Is radicular pain secondary to compression, inflammation and/or injury to a spinal nerve root?", Dr. Lord responded, "Yes." (Doc. 82, Ex. R, Lord's Answer to Interrog No. 11).  When asked in the next interrogatory, "Is it common for a physician to recommend medications (usually muscle relaxers, and pain killers), physical therapy, pain injections (such as cortisone and epidurals), and surgery as a last resort for this type of injury/problem?", Dr. Lord responded:

> I first prescribe anti-inflammatory medications by mouth or by injections (epidural steroid injections).  If the patient is non-responsive to the above and the nerve appears to be significantly compressed, I recommend surgery.  I rarely prescribe narcotics or muscle relaxers because of their addictive nature.  The only exception would be for the time frame following surgery or briefly after the patient suffered a traumatic injury, but not as chronic long-term pain management.  I do not typically prescribe physical therapy for radicular pain.

(*Id.* Answer to Interrog. No. 12).

When asked to clarify whether he "recommend[ed] and order[ed]" spinal canal injections for plaintiff, Dr. Lord responded:

> I did note on the consultation report that spinal canal injections were an option for treatment.  I did not, however, at the time, think they were medically necessary.  Inmate Harvey's alleged symptoms were significantly out of proportion to his examination and MRI findings. His loss of sensation does not follow the distribution of a pinched nerve in the back.  However, I noted the spinal injections on his report simply as a consideration for his treating physician. . . .

(*Id.*, Answer to Interrog. No. 13).

When asked if plaintiff's "condition [can] become worse if not treated?", Dr. Lord responded, "No, there is no treatment that can reverse or slow the progression of his arthritis." (*Id.*, Answer to Interrog. No. 17). When asked, "Can the damage to Plaintiff's spine become permanent and/or irreparable if it goes untreated?", Dr. Lord responded, "No, because there is no significant pathology noted on his spine, other than mild degenerative changes." (*Id.*, Answer to Interrog No. 18).

On October 16, 2008, Dr. Nazareno noted on plaintiff's chart the recommendations of defendant Dr. Lord, and requested the steroid injections from the Utilization Management Department ("UM"). (Doc. 77, Ex. G, Aviles Aff., Attach. 2). UM is a branch of the Department of Corrections' Health Services Office which is charged with approving and/or disapproving non-routine medical procedures and treatment. (*Id.*, Aviles Aff. ¶ 9).

On November 21, 2008, plaintiff submitted an inmate request stating, "I am supposed to be going to the orthopedic again for a shot in my back. How much longer will it be? I still am having pain daily with no relief!" (Doc. 82, Ex. J). Defendant Allin received plaintiff's request on November 24, 2008. (*Id.*, *see also* Doc. 77, Ex. G, Aviles Aff., Attach. 2). She answered the request on November 26, 2008, stating, "We are awaiting [sic] to hear from RMC on a[n] appointment date." (*Id.*).

On January 13, 2009, plaintiff submitted a sick-call request. SLPN Bickel noted on plaintiff's chart that plaintiff complained of "severe back pains" and inquired "Why haven't I been seen by the orthopedic surgeon at Lake Butler?" (Doc. 77, Ex. G, Aviles Aff., Attach. 2). Plaintiff's chart was forwarded to defendant Dr.

Aviles.  (*Id*.).  On January 14, 2009, defendant Aviles noted the requested spinal injections were not approved by UM due to:  (1) poor effort of the inmate during examination by Dr. Lord, (2) MRI minimal findings (minimal degenerative changes) and (3) subjective symptoms in excess of objective signs.  (Doc. 77, Ex. G, Aviles Aff. ¶ 11 and Attach. 2).

On January 23, 2009, plaintiff filed a formal grievance stating he was in pain and requesting the steroid injections.  (Doc. 82, Ex. N; Doc. 77, Ex. G, Aviles Aff. ¶ 12 and Attachs. 2, 6).  On February 6, 2009, defendant Dr. Aviles responded to plaintiff's January 23, 2009 formal grievance stating, "Review of your medical records shows that the recommendation by Dr. Lord for spinal canal injections was denied by the QM [sic] advisor."  (Doc. 82, Ex. N; Doc. 77, Ex. G, Aviles Aff. ¶ 12 and Attachs. 2, 6).  On February 11, 2009, plaintiff submitted an appeal to the Office of the Secretary concerning the denial of the spinal canal injections.  (Doc. 1, Ex. D).  The appeal was denied on March 23, 2009.  (*Id*., Ex. E).  In the meantime, on January 28, 2009, upon plaintiff's request, defendant Dr. Aviles referred plaintiff to the impair committee for an institutional transfer to a wheelchair camp.  (Doc. 77, Ex. G, Aviles, Aff. ¶ 13 and Attach. 2).

On January 29, 2009, at 2:00 p.m., plaintiff submitted a sick-call request stating:  "Dr. Aviles, I am still in continuous extreme pain in my spine and leg. Nothing has been done as per the order of the specialist.  It has been more than 90 DAYS since Dr. Lord's order.  The medicine given for pain DOES NOT WORK, AS I'VE TOLD YOU BEFORE!!!  Since I was injured on April 29, 2008 over 9 months ago I've had no treatment of substantial value or effect."  (Doc. 82, Ex. M).  On February 2, 2009, at 9:07 a.m., SLPN Bickel noted plaintiff requested information

about his next appointment for medical treatment from the orthopedic surgeon.  (Doc. 77, Ex. G, Aviles, Aff., Attach. 2; Doc. 82, Ex. P, Allin's Answer to Pl.'s Interrog. No. 5).  A nurse informed plaintiff that consultations would be completed as deemed necessary.  (*Id*.).  Plaintiff verbalized his understanding.  (*Id*.).

Also on February 2, 2009, plaintiff submitted an inmate request addressed to Dr. Aviles, stating the same complaints as his January 29, 2009 sick-call request;  (1) he was suffering from extreme pain in his back and leg, (2) he had received no treatment for his April 29, 2008 back injury and (3) the Naproxin was not relieving his pain.  (Doc. 77, Ex. I, Allin Aff. ¶ 3 and Attach. 1; Doc. 82, Ex. K).  Plaintiff added that he was beginning to experience numbness and pain in his arms.  He complained that "no one has given me a nerve test to determine if I have pinched nerves in my back," that he was in pain, and that he wanted "something to be done" and "something more than Naproxin for the pain."  (*Id*.).  Defendant Allin reviewed plaintiff's medical file.  (Doc. 77, Ex. I, Allin Aff. ¶ 3).  She did not see any notations of prior sick-call requests relating to complaints of numbness and pain in plaintiff's arms.  (*Id*.).  Plaintiff's other complaints relating to pain in his spine and leg had already been addressed by Nurse Bickel and Dr. Aviles.  (*Id*.).  Defendant Allin responded to the request on February 16, 2009, stating:  "Review of your medical record does not show any of these complaints at sick call.  If you are having medical problems follow sick call procedure for all medical issues."  (*Id*.).

On February 5, 2009, plaintiff submitted a sick-call request seeking renewal of his passes.  (Doc. 77, Ex. G, Aviles Aff., Attach. 2).  Nurse Bickel noted plaintiff's low bunk pass expired March 18, 2009, his cane and back brace pass expired February 10, 2009, his pass for no prolonged standing expired February 10, 2009, and

his front cuff pass expired March 10, 2009.  (*Id*.).  The nurse forwarded plaintiff's chart to a doctor.  That same day, Dr. Espino reviewed plaintiff's chart and noted:  (1) passes would be reviewed upon expiration and (2) doctors do not decide cuff placement.  (*Id*.).

Plaintiff was transferred out from Union CI on February 13, 2009.  (Doc. 1, p. 7-D); Doc. 77, Ex. G, Aviles Aff. ¶ 14 and Ex. I, Allin Aff. ¶ 4).   Thereafter, defendants Dr. Aviles and Ms. Allin had no further contact with plaintiff.

Analysis - Dr. Lord

Although defendant Lord asserts an exhaustion defense, the court need not address that issue.  Even assuming (without deciding) that plaintiff properly exhausted his administrative remedies, he cannot establish defendant Dr. Lord's conduct violated the Eighth Amendment.

Plaintiff claims Dr. Lord was deliberately indifferent to his serious medical needs – his alleged back injury sustained on April 29, 2008, and his need for stronger pain medication due to the alleged injury.  (Doc. 1, pp. 7-B, 7-C).  The record does not present a genuine issue of material fact as to whether plaintiff sustained a back injury on April 29, 2008.  The undisputed medical evidence – the results of plaintiff's physical examination, x-ray and MRI examination – offers no support at all for such a claim.  His x-ray was normal, and the MRI results reflect normal wear and tear, including a mildly compressed nerve.  Plaintiff fails to present any medical evidence from which a reasonable jury could find that as a result of the April 29, 2008 use of force, he sustained a back injury or further damage to his back rising to the level of an objectively serious medical need.

Similarly as to plaintiff's pain, the record reveals no genuine dispute as to

whether plaintiff had an objectively serious medical need for stronger pain medication.  Defendants' medical evidence demonstrates he did not.  Neither plaintiff's personal opinion, nor his evidence that he repeatedly complained of pain, is sufficient to raise a genuine dispute.  Although plaintiff argues the defendants' answers to discovery permit a reasonable jury to find that his condition <u>can</u> cause the level of pain he alleges, (doc. 88, pp. 3-5), the evidence does not bear that out. Defendants' responses are to general questions concerning whether certain conditions (some appearing on plaintiff's MRI and some not) "can" be painful.  (Doc. 88, Exs. D, E, F, G).  The defendants consistently state that the answer depends on the severity of the condition.  (*Id*.).  But neither the MRI results, the defendants' responses to discovery, nor any other medical evidence could permit a jury to find that plaintiff's objectively determined medical condition is severe, or of such severity as to give rise to the "extreme" pain he describes.  To the contrary, Dr. Lord describes plaintiff's condition as "mild" and his claimed pain "significantly out of proportion" to his objectively determined medical condition.  Furthermore, there is no objective medical evidence supporting plaintiff's allegations that he suffers from "radicular" pain.  Dr. Lord testifies, and plaintiff does not dispute, that plaintiff's complaints of radicular pain do not make anatomical sense.  Thus, even when viewed in the light most favorable to plaintiff, a reasonable jury could not conclude plaintiff had an objectively serious medical need for additional treatment or stronger pain medication for his back.

Even if there were a genuine dispute as to this first element of plaintiff's Eighth Amendment claim, the evidence concerning the second element is without substantial controversy and fails to establish Dr. Lord acted with an attitude of deliberate

indifference (*i.e.*, that he knew his treatment posed a substantial risk of serious harm to plaintiff and disregarded that risk by conduct that is more than gross negligence).

Plaintiff was referred to Dr. Lord upon complaints of low back and leg pain. Even though Dr. Lord was not convinced of the veracity of plaintiff's complaints and suspected he was malingering, he nevertheless ordered an MRI "to rule out any nerve damage to Plaintiff's spine." (Doc. 77, Ex. H, Lord Aff. ¶ 8). He also recommended various restrictive passes until the results came in supporting/negating plaintiff's complaints. (*Id.*, ¶ 4). When the MRI results came in, Dr. Lord reviewed the report and determined there were only mild degenerative changes (normal wear and tear) that did not merit strong pain medication and did not support plaintiff's subjective complaints of pain. Although the medical evidence did not show a medical necessity for further treatment, Dr. Lord authorized anti-inflammatory spinal injections as an option at the discretion of plaintiff's treating physician.

Plaintiff disagrees with Dr. Lord's assessment of the MRI results. He asserts it "showed much more than 'minimal degenerative changes'" (doc. 84, Pl.'s Aff. ¶ 4) and that it provides a basis from which a reasonable jury could infer Dr. Lord knew plaintiff had a serious medical need for additional treatment and stronger pain medication. (Doc. 82, p. 3 ¶ 8). However, as discussed above, the only medical evidence interpreting the radiologist's findings is Dr. Lord's testimony. That testimony – that the results gave rise to the option, but not necessity, for further treatment, and did not give rise to a need for stronger pain medication – remains undisputed. Plaintiff's personal opinion is insufficient to raise a genuine factual dispute.

Plaintiff further asserts Dr. Lord's answers to interrogatories establish that Lord

knew plaintiff had a serious need for stronger pain medication. (Doc. 82, pp. 3-4 ¶ 9; Doc. 84, Pl.'s Aff. ¶ 4). Plaintiff's argument, however, stands on misrepresentations of those answers. Plaintiff says Dr. Lord stated "that a compromised nerve can be painful, and that he could have ordered some stronger medication for plaintiff." (Doc. 82, pp. 3-4, Fact. No. 9 (citing Doc. 82, Ex. R, Lord's Answers to Pl.'s Interrog. Nos. 4, 6, 16)). What Dr. Lord said is: "a compromised nerve can be painful <u>if severely compressed</u>." (*Id.*) (emphasis added). The evidence does not reasonably support an inference that plaintiff had a severely compressed nerve. Dr. Lord also stated foraminal stenosis <u>can</u> produce a type of pain called radicular pain, <u>if the stenosis is severe</u>; however, he went on to state that "<u>such mild foraminal stenosis, as noted in inmate Harvey's MRI is not severe enough to pinch the nerve and consequently does not result in radicular pain</u>." (Doc. 82, Ex. R, Lord's Answer to Pl.'s Interrog. No. 7) (emphasis added). Further, the full context of Dr. Lord's answer concerning prescribing stronger pain medication for plaintiff is this: "I could have ordered something stronger for Inmate Harvey <u>if I felt his physical evaluation or MRI demonstrated that such was necessary</u>." (Doc. 82, Ex. R, Lord's Answer to Pl.'s Interrog. No. 16) (emphasis added). Dr. Lord's answers to interrogatories do not enable a reasonable jury to find Dr. Lord knew plaintiff had a serious medical need for stronger pain medication.

Again, although the record does not raise a genuine dispute as to any material fact, the evidence does not permit a reasonable jury to conclude Dr. Lord knew of and disregarded a substantial risk of serious harm to plaintiff's health or a serious medical need for stronger pain medication. Therefore, plaintiff's motion for summary judgment must be denied as to Dr. Lord.

Turning to Dr. Lord's motion, the summary judgment evidence does not create a question for the jury whether he was aware his treatment posed a substantial risk of serious harm to plaintiff.  The facts establish Dr. Lord responded reasonably to plaintiff's complaints.  Although a dispute exists concerning whether plaintiff informed Dr. Lord directly that the prescribed pain medication was ineffective, that dispute is not genuine.  Even assuming the truth of plaintiff's version –  that during a consultation with Dr. Lord he informed Lord that the prescribed pain medication "did nothing for the pain and [plaintiff] no longer took it for that reason and [plaintiff] needed something else that would effectively stop or dull the pain," (doc. 1, p. 7-B) – the evidence is not such that a reasonable jury could return a verdict for plaintiff.  Given Dr. Lord's testimony that none of the objective findings – the physical examination, x-ray or MRI results – revealed a condition meriting strong pain medication, that his complaints of pain were significantly out of proportion to his objectively determined medical condition, and that his complaints of numbness and radicular pain did  not make anatomical sense, a reasonable jury could not find Dr. Lord recklessly disregarded a serious medical need for stronger pain medication.

Reduced to its essence, plaintiff's deliberate indifference claim against Dr. Lord amounts to nothing more than plaintiff's disagreement with the doctor's medical opinion.  Disagreement with a prison doctor's medical judgment, however, cannot form the basis of an Eighth Amendment claim.  *See Harris v. Thigpen*, 941 F.2d at 1505 ("[A] simple difference in medical opinion between the prison's medical staff and the inmate" regarding the course of treatment does not state an Eighth Amendment claim."); *Adams v. Poag*, 61 F.3d 1537, 1545 (11th   Cir. 1995) "[W]hether governmental actors should have employed additional diagnostic

techniques or forms of treatment is a classic example of a matter for medical judgment and therefore not an appropriate basis for grounding liability under the Eighth Amendment.") (quotation marks omitted); *see also, e.g., Smith v. Fla. Dep't of Corrections*, 375 Fed. Appx. 905, 910 (11th Cir. 2010) (unpublished opinion) ("Smith's claim rests on his difference of opinion with the prison medical staff over the course of his treatment, which does not rise to the level of an Eighth Amendment violation.").

Based on the summary judgment evidence, a reasonable jury could not conclude Dr. Lord's conduct violated the Eighth Amendment.    Accordingly, defendant Lord's motion for summary judgment should be granted.

<u>Analysis - Dr. Aviles</u>

Plaintiff claims Dr. Aviles was deliberately indifferent to the alleged back injury and pain.  (Doc. 1, pp. 7-C, 7-D).  Plaintiff contends his repeated sick-call requests and grievance establish that "medical officials knew of plaintiff's injuries, extreme and continual pain, and simply failed to respond."  (Doc. 81, p. 20).  In order to hold Dr. Aviles personally liable, evidence must exist that Dr. Aviles personally knew of plaintiff's alleged injury and extreme pain.  Dr. Aviles may have known of those grievances and complaints that were referred to him or documented in plaintiff's chart.  Even so, to infer knowledge of any and all requests and grievances handled by other staff and not appearing in plaintiff's chart is unreasonable. *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.  Each individual Defendant must be judged separately and on the basis of what that person knows.") (citations omitted).

The record does not raise a genuine dispute as to any material fact concerning Dr. Aviles' knowledge and treatment.  Dr. Aviles' first contact with plaintiff was on August 11, 2008.  Plaintiff complained of needing "two passes and his med."  Dr. Aviles noted plaintiff had a limited gait.  He authorized a wheelchair pass for long distances, a cane pass for ambulation to the shower, a pass restricting the time plaintiff was allowed to stand, and a back brace to provide support to plaintiff's spine. Dr. Aviles also prescribed plaintiff 500 mg of Naproxin, an anti-inflammatory pain medication, for six months.  Dr. Aviles' next contact with plaintiff was on September 24, 2008, when Dr. Aviles confirmed plaintiff had a front cuff pass.  His next contact with plaintiff was on January 13, 2009, when he responded to plaintiff's sick-call request complaining of "severe back pains" and inquiring "Why haven't I been seen by the orthopedic surgeon at Lake Butler?"  Dr. Aviles noted the requested spinal injections were not approved by UM due to:  (1) poor effort of the inmate during examination by Dr. Lord, (2) MRI minimal findings (minimal degenerative changes) and (3) subjective symptoms in excess of objective signs.  Dr. Aviles notified plaintiff that the injections were disapproved.  Dr. Aviles did not make the decision to disapprove them.[3]  At plaintiff's request, Dr. Aviles referred plaintiff to the impair committee for an institutional transfer to a wheelchair camp.  After that, Dr. Aviles had no further contact with plaintiff.

No evidence or inference shows that Dr. Aviles was aware of plaintiff's subjective complaints of pain.  Also, no genuine dispute exists as to Dr. Aviles' response.  Dr. Aviles responded to each complaint referred to him.  He issued

---

[3]The evidence establishes it was the "UM advisor" who disapproved the injections.  Plaintiff identifies this person as Dr. Thayer.  (Doc. 1, p. 7-C).  Plaintiff has voluntarily dismissed his claims against defendant Dr. Thayer due to his death.  (Docs. 74, 75, 85).

appropriate passes and prescribed Naproxin – "the best anti-inflammatory available" – for plaintiff's alleged pain. (Doc. 77, Ex. G, Aviles Aff., p. 5 ¶ 15). Dr. Aviles did not provide stronger pain medication, but there is no triable issue concerning the reasonableness of that decision. Dr. Aviles knew an orthopedic specialist (Dr. Lord) had examined plaintiff, ordered an MRI and, after evaluating the results, determined there were only mild degenerative changes to plaintiff's spine which could not reasonably be expected to give rise to the type or severity of plaintiff's claimed pain. Plaintiff fails to present evidence from which a reasonable jury could infer Dr. Aviles must have known Dr. Lord grossly misjudged plaintiff's condition. Plaintiff's personal opinion about the MRI results does not create a triable issue.

Viewing the evidence in Dr. Aviles' favor, a reasonable jury could not conclude Aviles knew of and disregarded a substantial risk of serious harm to plaintiff's health or a serious medical need for stronger pain medication. Therefore, plaintiff's motion for summary judgment must be denied. Viewing the evidence in plaintiff's favor, a reasonable jury could not conclude Dr. Aviles was deliberately indifferent to an objectively serious need for additional treatment or stronger pain medication for plaintiff's back condition. Therefore, Dr. Aviles is entitled to summary judgment.

Analysis - Ms. Allin

Plaintiff claims Ms. Allin was deliberately indifferent to his serious medical needs when she "blocked access to a doctor by answering plaintiff's [February 2, 2009] request rather than forwarding it to the doctor." (Doc. 82, p. 3 ¶ 6 (citing Ex. K); *see also* Doc. 1, p. 7-D). Plaintiff asserts Ms. Allin is a "bookkeeper of medical records," and not a "medical professional." (*Id*., p. 3 ¶¶ 6-7). Therefore, she knew

denying plaintiff's request without forwarding it to medical staff exposed him to a substantial risk of serious harm.

Although defendant Allin asserts an exhaustion defense, the court need not decide that the issue because even assuming, without deciding, that plaintiff properly exhausted his administrative remedies, he cannot establish defendant Allin's conduct violated the Eighth Amendment. The facts underlying plaintiff's claim against defendant Allin are not genuinely disputed. The record establishes that at the time Ms. Allin responded to plaintiff's February 2, 2009 request, plaintiff's complaints of back and leg pain had already been addressed by medical staff, and his complaints of numbness and pain in his arms had never been brought to medical staff's attention through a sick-call request. Based on this evidence, even if Ms. Allin's response erroneously stated that none of plaintiff's complaints had been submitted to medical, a reasonable jury could not conclude that she knew her failure to forward plaintiff's request to medical staff and her instruction to follow sick-call procedure posed a substantial risk of serious harm to plaintiff's health. Therefore, plaintiff's summary judgment motion should be denied and defendant Allin's motion granted.

## CLAIMS AGAINST ARNP NICHOLS AND DR. COLLINS

Rule 56 Evidence

Plaintiff arrived at Santa Rosa CI on February 13, 2009 and was examined by medical staff (M. Hardin, a non-party). (Doc. 77, Ex. J, Nichols Aff. ¶ 3 and Attach. 1). Plaintiff was in a wheelchair. (*Id*. at Attach. 4). He was advised that neither a wheelchair pass nor a cane pass would be issued at that time due to his confinement in a close management dormitory. (*Id*. at Attachs. 1, 4). On February 24, 2009,

defendant ARNP Nichols attempted to examine plaintiff for a pass evaluation; however, plaintiff refused to leave his cell and come out to sick-call. (*Id*., ¶ 3 and Attach. 2). Plaintiff states his refusal was based on security staff's refusal to provide him a cane to ambulate to sick-call. (Doc. 84, Pl.'s Aff. ¶ 6).

That same date, February 24, 2009, plaintiff submitted a formal grievance (log number 0902-119-415) seeking renewal of his passes. (Doc. 77, Ex. K, Collins Aff., Attach. 3). He complained he arrived at Santa Rosa CI with valid passes, that he was told he would have to see "Dr. Nichols" to get new passes, and that she would not see him unless he walked to the nurses' station. Plaintiff asserted he could not walk without a walking aid "due to past injuries and no treatment for those injuries." (*Id.*). Defendant Dr. Collins denied the grievance on March 10, 2009, stating:

> In your request for administrative remedy or appeal, you indicated that you are requesting to have your passes renewed. You stated you can not ambulate on your own power. You stated you had a wheelchair pass.
>
> You had an appointment on 02/24/2009 with ARNP Nichols to have your passes reevaluated. You refused to come out of your cell. You stated you needed a wheelchair. The ARNP reviewed your medical records, there is no documentation indicating you can not walk. The ARNP answered a request on 02/25/2009 regarding these same issues. The answer stated: You can go to sick call for your issues. But there will be no wheelchair. This medical decision provided is consistent with current objective medical findings.

(*Id.*).

On March 2, 2009, plaintiff was called out to medical for a sick-call visit for pass renewal (cane, front cuff and wheelchair) and medication renewal, but refused to walk from his cell to the medical department for the stated reason he could not

walk without his cane.  (Doc. 77, Ex. J, Nichols Aff. ¶ 3 and Attachs. 3, 4; Doc. 84, Pl.'s Aff. ¶ 6).  Plaintiff's chart noted (in an entry by Nurse Austin, a non-party) that plaintiff had a history of stroke with left-side hemiplegia weakness, and that plaintiff walked with weakness to his left side dragging his left foot.  Nurse Austin discussed with plaintiff the risks and consequences of refusing medical services.  (Doc. 77, Ex. J, Nichols Aff., Attach. 4).  Plaintiff signed a Refusal of Health Services form.  (*Id.*, Attachs. 3, 4).  Nurse Austin reviewed plaintiff's chart and scheduled him for a call-out to be seen March 3, 2009, for pass evaluation.  (*Id.*, Attach. 4).

On  March  3,  2009,  Nurse  Nichols  examined  plaintiff  to  conduct  a  pass evaluation.  (Doc. 77, Ex. J, Nichols Aff. ¶ 4 and Attach. 4).  Plaintiff was assisted to sick-call by correctional officers.  He made no attempt to walk.  (*Id.*).  Nurse Nichols noted  there  was  no  muscle  atrophy  in  plaintiff's  leg.  (*Id.*).  Muscle  atrophy  is common in patients who are unable to bear weight on a leg for a long period of time. (*Id.*; *see also* Doc. 77, Ex. K, Collins Aff. ¶ 4).  Nurse Nichols did not see any other indication  that  plaintiff  was  unable  to  walk  without  the  use  of  a  cane.  (*Id.*). However, due to plaintiff's subjective complaints that he was unable to put pressure on his leg, she issued plaintiff a one-year pass (effective 3/3/09 - 3/3/10) permitting use of a cane outside his cell (i.e., inside the dormitory), a pass for front-side cuffing when using his cane, and a pass for low bunk placement.  (*Id.*; *see also* Doc. 82, Ex. 1).  She advised plaintiff that if he used his cane as a weapon he would lose his cane and front-cuff passes permanently with no discussion.  (Doc. 77, Ex. J, Nichols Aff. ¶ 4 and Attach. 4).

On March 10, 2009, Defendant Nichols prescribed plaintiff Motrin 600 mg to be taken twice a day for 90 days.  (*Id.*, Nichols Aff. ¶ 5 and Attach. 5).  Motrin is a

non-steroidal anti-inflammatory drug used to used to treat inflammation and is typically prescribed for pain.  (*Id*., Nichols Aff. ¶ 5).

On March 18, 2009, plaintiff re-submitted a formal grievance (which he had originally submitted as an emergency grievance to the Office of the Secretary on March 2, 2009, but which was returned to him without processing on procedural grounds) complaining his cane, wheelchair and front-cuff passes from Union CI were not honored at Santa Rosa CI.  He requested re-issuance of the passes.  (Doc. 77, Ex. K, Collins Aff. ¶ 6 and Attach. 6).  Dr. Collins denied the request, noting that plaintiff was evaluated by the ARNP on March 3, 2009, and his passes for low bunk, front cuff, and use of a cane outside of cell were all renewed.  (*Id*.).

On March 30, 2009, plaintiff filed an inmate request stating he was in "extreme pain" in his back and leg.  (*Id*., Nichols Aff. ¶ 6 and Attach. 6; Doc. 81, Ex. Z).  He stated that the Ibuprofen prescribed at sick-call was "not working."  (*Id.*).  He also requested a "comprehensive nerve test," because he believed he had "damaged nerves."  (*Id*.).  Nurse Nichols reviewed plaintiff's medical file, noting he had received an x-ray, a MRI and evaluation by the orthopedic surgeon.  Based on this information, she concluded "that Plaintiff's subjective complaints were inconsistent with his actual physical condition, and that a 'comprehensive nerve test.' was unnecessary." (*Id*., Nichols Aff. ¶ 6).  She responded to plaintiff's inmate request on March 30, 2009, stating:  "You have been examined and tested for your complaints. NSAIDs [Non-Steroidal Anti-Inflammatory Drugs] or Tylenol are the treatment." (*Id*. and Attach. 6; Doc. 81, Ex. Z).

Dr. Collins left his employment with the Department of Corrections on April 2, 2009.  (Doc. 77, Ex. K, Collins Aff. ¶ 8).

On April 8, 2009, plaintiff submitted a medical grievance complaining that ARNP Nichols' response to his inmate request was "a lie," and that he had never been tested for damaged or pinched nerves.  (Doc. 81, Ex. A-1).  He complained that he was in pain daily and that the prescribed pain mediation was ineffective.  On April 4, 2009, Regional Health Services Executive Director Dr. Rummel (a non-party) denied the grievance, stating:

> In your request for administrative remedy or appeal, you indicated that you are not being provided proper treatment for back pain.  You stated you had not been tested for damaged or pinched nerves.
>
> You were examined by ARNP Nichols on 03/03/09.  She documented you do not have any muscle loss in your legs [sic] muscles.  Muscle loss usually occurs with nerve damage.  She issued passes for low bunk, cane uses outside of cell, front cuff and no work due to your back problem.  A review of your revealed x-rays (back) lumbar and pelvis on 07/30/08 were within normal limits; an MRI on 08/14/08 would show a pinched nerve.  If you are still having problems return to sick call and be reevaluated.

(*Id*., Ex. B-1).

On May 26, 2009, plaintiff's prescription for Motrin was renewed.  (*Id*., Nichols Aff., ¶ 5 and Attach. 5; *see also* Doc. 77, Ex. K, Collins Aff., Attach. 5).

On July 30, 2009, plaintiff filed an "emergency medical grievance" (log #0907-119-490) complaining he was denied medical attention when security staff (Sgt. Grant and Officer Quilin) refused to provide his cane for walking from his cell to the medical room to attend a medical call-out, even after plaintiff informed them of his March 3, 2009 pass permitting use of a cane outside his cell.  (Doc. 82, Ex. T).  Institutional staff received the grievance on July 31, 2009, and responded on August 12, 2009:  "Lt. Diermyer has investigated your complaint and he was informed that

Mrs. Nichols had instructed that you only needed your cane for out of cell programs and outside the dormitory." (*Id*., Ex. U). Plaintiff filed a second medical grievance on July 30, 2009, (log #0908-119-033) complaining that after he told a nurse (Nurse VonOven, a non-party) of security staff's conduct, she responded that plaintiff did not need his cane for ambulating in the dormitory and that if he "kept it up," his cane would be taken from him.  Plaintiff complained that Nurse VonOven had effectively modified his cane pass.  (*Id*., Ex. V).  Institutional staff received the grievance on August 3, 2009, and responded on August 18, 2009: "In your administrative remedy or appeal, you indicated that Nurse VonOven modified your cane pass.  Nurse VonOven did not modify your cane pass.  She questioned if you needed your cane for the short distance in the dorm, from your cell to the medical room.  Security informed the nurse you refused to come out for sick call.  If security is denying you your cane sign up for sick call and be evaluated.  If you still need sick call put in another slip." (*Id*., Ex. W).  Plaintiff filed a third medical grievance on July 30, 2009, (log #0908-119-034), this one addressed to the warden.  (*Id*., Ex. X).  Plaintiff complained that later the afternoon of July 30, Sgt. Grant returned to plaintiff's cell and "threatened" him that he would lose his cane pass.  Plaintiff further complained Grant told him  "the ARNP" said plaintiff did not need his cane to go to the shower. (*Id*.).  Institutional staff received the grievance on August 3, 2009, and responded on August 18, 2009:  "In your administrative remedy or appeal, you indicated that Sgt. Grant threatened you that your can pass was only good outside the dorm per ARNP Nichols.  A review of your medical records does not indicate a request or order by ARNP Nichols to remove or change your cane pass.  You may wish to clarify your pass by sending a request to ARNP Nichols." (*Id*., Ex. Y).

After filing those grievances but before receiving the responses, plaintiff submitted an inmate request to defendant Nichols on August 5, 2009, stating:

> I'm told that you've stated to security that I can only use my cane if I leave the dorm.  I need my cane for support when I walk.  You gave me a pass for outside my cell so I can go to the shower and wherever else I need to go outside my cell.  Since I cannot put pressure on my left leg without extreme pain, my cane is NEEDED outside my cell as my pass states.  There was no problem in G-Dorm using my can outside my cell so why is it a problem in E-Dorm?  I need to go to sick call but security will not honor my pass that you gave me.  I don't intend on crawling to the nurses' station – that should not be necessary since I've had no problem with my cane to cause it to be taken!  Can you please notify security in E-Dorm that I can use my cane outside my cell since they are not honoring my pass.

(*Id*., Ex. Z).  Nurse Nichols responded on August 6, 2009, stating:  "The shower is right by your cell – you do not need a cane – so since this is becoming such an issue with you I will reassess your need for a cane at all."  (*Id*.).

On August 10, 2009, plaintiff submitted a medical grievance that "the ARNP has stated to me that I don't need my cane.  However, this is untrue!" (Doc. 88, Ex. N).  He went on to state that he cannot put full pressure on his left leg and he did not want Nurse Nichols to reassess his need for a cane pass.  (*Id*.).  He further stated he needed a cane outside his cell because he would "fall over" without its support, and Nurse Nichols knew he could not "walk on his own power."  The new Chief Health Officer at Santa Rosa CI, Dr. Asante (a non-party), construed plaintiff's grievance as "requesting to use your cane to go to the shower."  (*Id*.).  She responded on August 21, 2009, stating "The shower is located next to your room.  No cane needed per ARNP Nichols."  (*Id*.).

On August 11, 2009, Nurse Nichols re-evaluated plaintiff's cane pass to

determine if he needed a cane for ambulation inside the dormitory.  (Doc. 77, Ex. J, Nichols Aff. ¶ 7 and Attach. 4).  She noted plaintiff complained of security staff not giving him his cane when he left his cell.  According to defendant Nichols, plaintiff admitted he was able to walk without a cane, but stated walking without it hurt his leg and he would not subject himself to pain.  (*Id*.).  Plaintiff, in his own affidavit, disputes this fact "to the extent that plaintiff never stated to Defendant Nichols that he could walk on his leg without a cane."  (Doc. 84, Pl.'s Aff. ¶ 7).  Nurse Nichols examined plaintiff and observed he ambulated slowly and bore weight on both legs.  His balance was "fine."  (Doc. 77, Ex. J, Nichols Aff. Attach. 4).  She further noted, "cane does not enable him to walk - he can walk without cane."  (*Id*.).  Nurse Nichols changed plaintiff's cane pass from permitting use inside the dormitory to outside dorm use only, noting "Inmate states he will fall which I am sure he will, but he is quite able to walk about in cell without problems and I am sure this will be a manipulation."  (Doc. 77, Ex. J, Nichols, Aff. ¶ 7 and Attach. 4; *see also* Doc. 82, Ex. 2).  Plaintiff states the only reason he is able to ambulate in his cell without his cane is because it is a handicapped cell equipped with bars on the wall and stationary furniture.  Plaintiff moves about the cell using the bars on the wall and/or the stationary furniture (toilet, sink, desk, bench, bunk) in the cell.  (Doc. 84, Pl.'s Aff. ¶8).

Nurse Nichols further explains in her affidavit:

> Because Plaintiff is housed in a Close Management dormitory, his cane pass was changed from inside the dorm to outside the dorm use only.  As a clinician in a prison setting, I must consider both patient care and security when administering treatment.  This is why any medical equipment that can be utilized as a weapon, such as a cane, is not authorized unless it is absolutely necessary.  As a result of Plaintiff's

statement that he was able to walk without the use of the cane and my objective findings of the same, I changed Plaintiff's pass to outside dorm use only.  Contrary to Plaintiff's statement, I did not change the nature of his cane pass out of retaliation, but as a result of his examination, the information in his file, and security concerns.

(Doc. 77, Ex. J, Nichols Aff. ¶ 7).  Plaintiff has been a Close Management inmate since May 13, 2008.  (*Id.* n. 1).  Plaintiff states he was assigned to CM after he was found guilty of using his cane as a weapon.  (Doc. 84, Pl.'s Aff. ¶ 7).  Since then, however, "there have been no security issue or concern at all involving the plaintiff and the use of his cane as a weapon." (*Id.*).

Close Management ("CM") is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others."  FLA. ADMIN. CODE ANN. r. 33-601.800(1)(d).  There are three individual levels (CM I, CM II and CM III) associated with Close Management.  *Id.* r. 33-601.800(1)(e).  Of the three levels, CM I is the most restrictive single cell housing level and CM III is the least restrictive.  (*Id.*).  Plaintiff is a CM II inmate.  (Doc. 77, Ex. J, Nichols Aff. ¶ 7 n. 1).

Plaintiff states that despite the August 11, 2009 change to his cane pass, security staff in his dormitory continue to allow him use of his cane outside his cell within the dormitory.  (Doc. 84, Pl.'s Aff. ¶ 8).

Analysis - Deliberate Indifference Claim Against ARNP Nichols

Plaintiff claims defendant Nichols was deliberately indifferent to his serious medical need for "effective pain medication." (Doc. 1, p. 7-F ¶ 12).  The record reveals no genuine dispute as to any material fact concerning defendant Nichols'

treatment of plaintiff's pain.  It is undisputed ARNP Nichols was aware plaintiff vocalized allegations of pain on several occasions.  (Doc. 82, Nichols' Answer to Pl.'s Req. for Admis. No. 11).  But the evidence also establishes ARNP Nichols prescribed Motrin to relieve his pain.  After plaintiff complained the medication was not effective, she examined plaintiff's medical chart, including his x-ray and MRI results and the orthopedic surgeon's findings and recommendations.  Because plaintiff's subjective complaints of the severity of pain and need for stronger pain medication were not supported by the objective medical findings, she did not prescribe stronger medication.  Plaintiff disagrees with her medical judgment, but fails to provide evidence from which a reasonably jury could find that she grossly misjudged plaintiff's condition.  Plaintiff's non-medical opinion about the severity of his condition is insufficient to raise a genuine dispute on the issue.  Because the record reveals no genuine dispute as to any material fact, and the evidence could not enable a reasonable jury to conclude defendant Nichols knew of an obvious need for stronger pain medication and disregarded that need by conduct that is more than gross negligence, plaintiff is not entitled to summary judgment.   For the same reason, defendant Nichols is entitled to summary judgment on plaintiff's medical deliberate indifference claim.

Analysis - Retaliation Claim Against  ARNP Nichols

Plaintiff also raises a First Amendment retaliation claim against defendant Nichols, alleging that her August 11, 2009 reassessment and modification of his March 3, 2009 cane pass allowing use of his pass outside his cell (inside the dormitory) was in retaliation for filing grievances that the pass was not being honored.  (Doc. 1, p. 7-F ¶ 14 and p. 8).

"The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech." *Farrow v. West*, 320 F.3d at 1248. "It is an established principle of constitutional law that an inmate is considered to be exercising his First Amendment right of freedom of speech when he complains to the prison's administrators about the conditions of his confinement." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008) (citing *Farrow*, 320 F.3d at 1248); *O'Bryant v. Finch*, No.09-13493, — F.3d —, 2011 WL 1261132, at *3 (11th Cir. Apr. 6 2011) ("An inmate may maintain a cause of action for retaliation under 42 U.S.C. § 1983 by showing that a prison official's actions were 'the result of [the inmate's] having filed a grievance concerning the conditions of his imprisonment.'") (quoting *Farrow*, 320 F.3d at 1248).

To prevail on a retaliation claim, the inmate must establish: "(1) his speech was constitutionally protected; (2) he suffered adverse action such that the [official's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action [re-evaluating and modifying plaintiff's cane pass] and the protected speech [the grievances]." *Mosley*, 532 F.3d at 1276. Because the core of a First Amendment retaliation claim is that the prisoner is being retaliated against for exercising his right to free speech, the prisoner is not required to allege the violation of an additional separate and distinct constitutional right. *O'Bryant*, at *3 (citing *Mosley*). In other words, plaintiff need not show that the reassessment and modification of his cane pass also violated his right to adequate medical care.

The record reveals no genuine dispute as to these facts: (1) plaintiff was a CM inmate at the time the March 3, 2009 cane pass issued as well as when it was

reassessed and modified on August 11, 2009, (2) the March 3, 2009 pass permitted plaintiff to use his cane outside his cell within the dormitory, (3) the March 3, 2009 pass did not expire until March 3, 2010, (3) defendant Nichols was aware of plaintiff's August 5, 2009 inmate request/informal grievance complaining that the pass was not honored, and responded: "The shower is right by your cell.  You do not need a cane so since this is becoming such an issue with you I will reassess your need for a cane at all," (4) defendant Nichols modified plaintiff's pass on August 11, 2009 to permit use of a cane only outside the dormitory.  However, divergent ultimate inferences may reasonably be drawn from these undisputed facts.  A reasonable jury could infer from Nichols' response and the timing of her reassessment (7 months prior to expiration and immediately following the informal grievance) that her reassessment was in retaliation for plaintiff filing the informal grievance.   A reasonable jury could also infer that Nichols' decision to reassess the pass was motivated by other concerns such as security or abuse (plaintiff insisting on staff providing him a cane even when it was clearly unnecessary).

Furthermore, the parties hotly dispute several material facts, for example, whether plaintiff admitted he could walk without his cane, and whether he is able to ambulate short distances without it.  A reasonable jury could believe defendant Nichols' testimony that her modification of plaintiff's pass was not out of retaliation but as a result of plaintiff's admission he could walk without a cane, her physical examination of him, the information in his medical file and security concerns.  (Doc. 77, Ex. J, Nichols Aff. ¶ 7).  On the other hand, a reasonable jury, assessing the credibility of the relevant witnesses, could also believe plaintiff's testimony that he never told defendant Nichols he could walk on his leg without a cane, that her

reference to security concerns is pretextual because both before and after modification of his cane pass he was allowed to use his cane inside the dormitory despite being a CM inmate, and that he is able to ambulate in his cell without a cane only because his cell has bars and stationary furniture for support.  (Doc. 84, Pl.'s Aff, ¶ ¶ 7, 8).   "The Court's role at the summary judgment stage is merely to assess the sufficiency of the evidence, not the credibility of the parties." *Frede v J. C. Penney Corp., Inc.,* 2007 WL 2254513, *3, n. 1 (M. D. Fla. 2007) (citing *Fed. R. Civ. P. 56(c)*, *Anderson v. Liberty Lobby, Inc.,* 477 U. S. 242 at 248).   Triable issues precluding summary judgment (in favor of either party) exist on the merits of plaintiff's retaliation claim.  Therefore, plaintiff's motion must be denied.  Defendant Nichols' motion requires additional analysis on the issue of qualified immunity.

It is undisputed that defendant Nichols was acting within her discretionary authority in reassessing and modifying plaintiff's cane pass.  As discussed above, viewing the summary judgment evidence in the light most favorable to plaintiff, the facts permit a reasonable jury to conclude defendant Nichols' conduct violated plaintiff's First Amendment rights.  The court must therefore decide whether the evidence will support a finding that a reasonable prison official standing in defendant Nichols' shoes should have realized at the time she engaged in the alleged retaliatory conduct that she was violating a clearly established constitutional right. The law was clearly established in August of 2009 that a prison official may not penalize an inmate in retaliation for exercising his right to file grievances against prison officials.  *See Boxer X v. Harris*, 437 F.3d 1107, 1112 (11th Cir. 2006) ("First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his

imprisonment."); *Farrow*, 320 F.3d at 1248 ("The First Amendment forbids prison officials from retaliating against prisoners for exercising the right of free speech."); *Hicks v. Ferrero*, 241 Fed. Appx. 595, 598-99 (11th Cir. 2007) (unpublished opinion) ("We concluded as early as 1989 – well before this decision was made – that a prisoner's First Amendment free speech rights are violated when prison officials retaliate against him or her for filing a grievance." (citing *Wildberger v. Bracknell*, 869 F.2d 1467, 1468 (11th Cir. 1989)).  Because a prisoner's First Amendment right to be free from retaliation had become sufficiently clear by the time of the events giving rise to plaintiff's claim, a reasonable person would understand defendant Nichols' alleged conduct violated that right; she cannot claim qualified immunity as a bar to plaintiff's retaliation claim.

Based on the foregoing, the parties' motions for summary judgment should be denied as to plaintiff's First Amendment retaliation claim against defendant Nichols.

## LIMITATION ON PLAINTIFF'S RECOVERY AT TRIAL

Plaintiff seeks compensatory, punitive and nominal damages on his retaliation claim, as well as the following equitable relief:  "injunctive relief for effective medication and the use of medical device (walking cane)."  (Doc. 1, p. 8).  Defendant Nichols argues, and the undersigned agrees, that plaintiff's claims for compensatory and punitive damages on the retaliation claim should be dismissed.

The Prison Litigation Reform Act ("PLRA") provides, "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).  Addressing the implications of § 1997e(e),

the Eleventh Circuit has concluded: "the phrase 'Federal civil action' means all federal claims, including constitutional claims." *Napier v. Preslicka*, 314 F.3d 528, 532 (11th Cir. 2002) (citing *Harris v. Garner*, 216 F.3d 970, 984-85 (11th Cir. 2000) (en banc)). This action, brought by plaintiff under 42 U.S.C. § 1983, is a "Federal civil action" under this definition. It is undisputed that plaintiff filed his complaint while imprisoned, and that the harm complained of occurred while he was in custody. Plaintiff's damages claims are apparently based on the emotional distress he suffered as a result of defendant Nichols' retaliation, and/or the fact of the alleged constitutional violation itself (divorced from any mental or emotional injury it caused). The complaint alleges no physical injury resulting from the allegedly retaliatory reassessment and modification of his cane pass. Indeed, plaintiff admits: "[S]ecurity has always continued to allow plaintiff to use his cane outside of his cell even after August 11, 2009 when Defendant Nichols reassessed the plaintiff['s] pass." (Doc. 84, Pl.'s Aff. ¶ 8). Therefore, while imprisoned plaintiff is prohibited under the PLRA from bringing his claims for compensatory and punitive damages. *Harris v. Garner*, 190 F.3d 1279, 1287-88 (11th Cir. 1999) ("*Harris I*"), *vacated in part and reinstated in part on reh'g*, 216 F.3d 970 (11th Cir. 2000) (en banc) ("*Harris II*") (affirming district court's dismissal of claims for compensatory and punitive damages as barred by § 1997e(e)); *Smith v. Allen*, 502 F.3d 1255, 1271 (11th Cir. 2007) (stating that under Eleventh Circuit case law, § 1997e(e) precludes an inmate's claims for compensatory and punitive damages); *Al-Amin v. Smith*, — F.3d —, 2011 WL 1237941 (11th Cir. Apr. 5, 2011) (affirming district court's granting of motion in limine precluding prisoner from offering evidence to support an award of punitive damages on his First Amendment claim because the claim did not assert a physical

injury); *Williams v. Brown*, No. 08-16230, 347 Fed. Appx. 429, 436 (11th Cir. 2009) (unpublished opinion) (holding that prisoner could not recover compensatory or punitive damages with respect to his First Amendment retaliation claim, because he failed to alleged the requisite physical injury).  If successful, the only damages plaintiff will be able to recover are nominal ones.

As to plaintiff's request for injunctive relief, his transfer to Okaloosa CI has mooted the request.  Because plaintiff is no longer confined at Santa Rosa CI, no order from this court requiring defendant Nichols to act as plaintiff requests could have any effect.  Furthermore, since there appears no reason to believe plaintiff will again be confined at Santa Rosa CI under the same circumstances, the narrow exception for cases that are capable of repetition yet evading review does not apply. *See, e.g., Zatler v. Wainwright*, 802 F.2d 397, 399 (11th Cir. 1986) (inmate's release from prison mooted claim for declaratory and injunctive relief); *Wahl v. McIver*, 773 F.2d 1169, 1173 (11th Cir. 1985) (an inmate's claim for injunctive and declaratory relief in a section 1983 action fails to present a case or controversy once the inmate has been transferred); *McKinnon v. Talladega Cnty.,* 745 F.2d 1360, 1363 (11th Cir. 1984) (inmate's transfer to a different jail moots claim for declaratory and injunctive relief); *Dudley v. Stewart*, 724 F.2d 1493, 1494 (11th Cir. 1984) (transfer from county jail to state prison mooted claims for injunctive and declaratory relief against county jailers).  Therefore, plaintiff's claims for injunctive relief should be dismissed.

Analysis - Dr. Collins

Plaintiff claims Dr. Collins was deliberately indifferent to his serious medical need for "effective pain medication." (Doc. 1, pp. 7-E, 7-F).  Plaintiff argues the MRI results and his complaints of pain in his March 3, 2009 and April 8, 2009 grievances

put Dr. Collins on notice of his need for stronger medication. (*Id.; see also* Doc. 81, ¶¶ 19-21; Doc. 82, ¶¶ 16, 17).

The record reveals no genuine dispute as to any material fact concerning the extent of Dr. Collins' involvement in plaintiff's care. In the 2-month overlap between plaintiff's arrival at Santa Rosa CI and Dr. Collins' departure, plaintiff was not referred to Dr. Collins for examination or treatment. (Doc. 77, Ex. K, Collins Aff. and Attach. 1). Dr. Collins' acted only by responding to two grievances relating to plaintiff's passes – plaintiff's February 24, 2009, grievance and his March 18, 2009, grievance. Those grievances related solely to the issue of plaintiff's passes. Plaintiff did not complain of pain or that his medication was ineffective. (Doc. 77, Ex. K, Collins' Aff., Attachs. 3, 6). Although plaintiff says he complained of pain during his March 3, 2009 examination by ARNP Nichols, there is no dispute that Dr. Collins was not part of that examination. (Doc. 77, Ex. K, Collins' Aff. ¶ 4 and Attach. 1; Doc. 77, Ex. J, Nichols' Aff. ¶4). Further, although plaintiff addressed his March 30, 2009 inmate request to Dr. Collins, the record demonstrates that pursuant to DOC procedure, ARNP Nichols responded to the request without referring it to a physician. (Doc. 77, Ex. K, Collins' Aff. ¶ 7 and Attach. 1; Doc. 77, Ex. J, Nichols' Aff. ¶ 6; Doc. 81, Ex. Z). Plaintiff filed his April 8, 2009 medical grievance after Dr. Collins left employment with the DOC. Therefore, an inference cannot reasonably be drawn that the grievance put Dr. Collins on notice of plaintiff's complaints of pain and inadequate pain medication.

On this record, a reasonable jury could not find defendant Dr. Collins knew of and disregarded an alleged need for stronger pain medication. Therefore, although no genuine issue of material fact exists, plaintiff cannot prevail on his motion for

summary judgment.  Dr. Collins, on the other hand, has established that, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could not conclude he was deliberately indifferent to a serious medical need for stronger medication. Therefore, Dr. Collins is entitled to summary judgment.

Accordingly, it is respectfully RECOMMENDED:

1.  That plaintiff's motion for summary judgment (doc. 81) be DENIED.

2.  That defendants' motion for summary judgment (doc. 77) be GRANTED IN PART AND DENIED IN PART AS FOLLOWS:  the motion should be granted as to all claims, except plaintiff's First Amendment retaliation claim against defendant Nichols.  The motion should be denied as to that claim.

3.  That plaintiff's claims for compensatory and punitive damages on his First Amendment retaliation claim against defendant Nichols be DISMISSED WITHOUT PREJUDICE.

4.  That plaintiff be precluded from recovering compensatory or punitive damages resulting from defendant Nichols' alleged retaliatory conduct, but not precluded from recovering nominal damages should the trier of fact find in his favor on the First Amendment retaliation claim.

5.  That plaintiff's claims for injunctive relief be DISMISSED as moot.

6.  That plaintiff's First Amendment retaliation claim against defendant Nichols be remanded to the undersigned for further proceedings on that claim.

At Pensacola, Florida this 19th day of May, 2011.

*/s/ Charles J. Kahn, Jr.*
CHARLES J. KAHN, JR.
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *Se*e 28 U.S.C. § 636; *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988).